**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WENDY LOHMEIER, )<br><br>Plaintiff, )<br><br>vs. )<br><br>GOTTLIEB MEMORIAL HOSPITAL and<br>LOYOLA UNIVERSITY MEDICAL<br>CENTER,<br>Defendants. ) | Case No.:<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff, Wendy Lohmeier ("Lohmeier" or "Plaintiff"), by her attorneys, Peter M. Katsaros and Gillian G. Lindsay of Hahn Loeser & Parks LLP, complains against Defendants, Gottlieb Memorial Hospital ("Gottlieb") and Loyola University Medical Center ("Loyola") (collectively, the "Defendants") as follows:

### Nature of Action

1.    This lawsuit arises under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), for Defendants' discrimination against Lohmeier on the basis of her color (dark-skinned Latina) and national origin (Salvadoran), and Defendants' retaliation against Lohmeier after she complained of discriminatory treatment by Defendants.

2.    This lawsuit also arises under Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101 *et seq.*, for Defendants' discrimination against Lohmeier, a qualified individual with disability (person recovering from shingles and receiving mental health treatment), for Defendants' failure to accommodate Lohmeier, and retaliation against Lohmeier because she engaged in protected activity.

3.     In addition, the lawsuit arises under Sections 105 and 825.220 of the Family Medical Leave Act ("FMLA") and its implementing regulations, 29 U.S.C. 2601, *et seq.*, § 825.220, for Defendants' interference with Lohmeier's attempt to exercise her FMLA rights and discriminating and retaliating against Lohmeier for attempting to exercise her FMLA rights.

4.     Defendants also violated Lohmeier's rights under the Illinois Human Rights Act, 735 ILCS 5/2-1-101 *et seq.*, for Defendants' discrimination against Lohmeier on the basis of her color (dark-skinned Latina), national origin (Salvadoran), and disability, and Defendants' retaliation against Lohmeier after she complained of discriminatory treatment by Defendants and requested accommodation.

## Parties

5.     Lohmeier, at all times relevant to this dispute, worked and resided in this judicial district.

6.     Upon information and belief, Gottlieb is an Illinois not-for-profit corporation with its principal place of business at 701 W. North Ave., Melrose Park, IL 60160.

7.     Upon information and belief, Loyola is an Illinois not-for-profit with its principal place of business at 2160 S. 1st Ave., Maywood, IL 60153.

## Jurisdiction and Venue

8.     This Court has jurisdiction over Counts I through VIII under the express provisions of the 28 U.S.C. § 1331.

9.     Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391, because all significant events giving rise to the claims occurred in this judicial district.

11420457.2

10.     Venue is also proper in the Northern District of Illinois, Eastern Division because Defendants do business and have employees located within this judicial district.

**Factual Allegations**

11.     Lohmeier is a Registered Nurse.

12.     Her career in healthcare started in the U.S. Army as an Intelligence Analyst, when she served as a Combat Lifesaver and worked in Chemical, Biological, Nuclear, and Radiological Defense as well as Human Biometrics Collection and Analysis.

13.     After her military service, which included a fifteen-month tour for Operation Iraqi Freedom, Lohmeier worked for Catholic Charities in Street Outreach Services.

14.     In that role, Lohmeier assisted in designing and initiating the organization's homeless veterans' program.

15.     She received her B.A. in social work in 2012 and her THR/UTA Accelerated B.S. in Nursing in 2014, from the University of Texas at Arlington in Arlington, Texas.

16.     In February 2015, Lohmeier began her nursing career as a staff nurse at Texas Health Resources HEB.

17.     In that role, Lohmeier completed the versant residency 18-week preceptor program and generally served 5-7 patients with conditions such as GI diseases and bleeds, endocrine disorders, pulmonary and respiratory insufficiency diseases, renal impairment and injuries, and neurological deficiencies.

18.     In March 2016, Lohmeier began working as a staff nurse at the MacNeal Hospital Transitional Care Unit/Inpatient Rehab ("MacNeal"), in Berwyn, Illinois.

19.     At MacNeal, Lohmeier treated adult patients in need of rehabilitation services for reduction in ADLs and deconditioning due to orthopedic surgery, fractures, cerebrovascular

3

accident, coronary artery bypass graft surgery, acute AMS, and those in need of antibiotic/medical therapy.

20.     In addition to being a qualified registered nurse, Lohmeier is bilingual and uses her excellent interpersonal skills to communicate with patients in Spanish and English.

21.     On or around October 9, 2016, Lohmeier applied for a registered nurse position in the Center for Heart and Vascular Medicine at the Loyola University Medical Center in Maywood, Illinois.

22.     In December 2017, Gottlieb posted a Critical Care Registered Nurse position.

23.     Upon information and belief, Gottlieb is an acute care hospital with 247 licensed beds and a Level II Trauma Center. The Gottlieb hospital and campus are part of Loyola.

24.     On or around December 7, 2017, Lohmeier submitted a transfer request for the Gottlieb position. She interviewed and was selected for the job.

25.     Lohmeier began working at Gottlieb in February 2018.

26.     In or around July 2018, Lohmeier received her first performance evaluation at Gottlieb.

27.     Her annual Performance Planning and Review for 2018 indicates she was meeting expectations and fulfilling the job requirements.

28.     Her supervisor wrote:

Wendy has been off of orientation only a short time, but since that time has had much experience taking care of critical patients. She has been the primary nurse in several critical situations, including code blue, and has done an excellent job. She does well keeping the patient and family updated. She is completing her tasks by the end of her shift and able to clock out on time. She is building great relationships with her peers, physicians, and other disciplines.

Wendy is doing well with her documentation. Her attendance has been perfect. She has met the requirements for unit meeting audience. Our goal for Wendy for the upcoming year is to continue to grow in her role as a new critical care nurse.

29.      In July 2018, Lohmeier became very ill.

30.      Lohmeier called off work.  She went to see her doctor that same day.  Her treating physician diagnosed her with shingles.

31.      After the doctor's appointment, Lohmeier called the permanent charge nurses, Megan Daniels and Debra Shrousberry, and informed them she had shingles and would need FMLA leave.

32.      One of the charge nurses emailed Lohmeier the FMLA forms.

33.      Lohmeier and her treating physician completed the forms and submitted them pursuant to the Human Resources policy.

34.      After two weeks, Lohmeier's treating physician cleared her to return to work.

35.      Lohmeier returned to work in or around August 2018.

36.      In September 2018, Lohmeier was honored as Employee of the Month.

37.      While Lohmeier was recovering from shingles, she still experienced pain at the rash site even though the rash had healed.

38.      For some people, like Lohmeier, shingles pain continues long after the blisters have cleared. This condition is known as postherpetic neuralgia. It occurs when damaged nerve fibers send confused and exaggerated messages of pain from the skin at the rash site to the brain.

39.      The evening of Thursday, October 11, 2018, Lohmeier could not sleep because of a flare up of pain at the shingles rash site.

40.     As directed by her treating physician, Lohmeier took a single dose of Norco between 11:00 p.m. and 12:00 a.m. to alleviate the pain and allow her to get some sleep before her upcoming twelve-hour shift from 7:00 a.m. to 7:00 p.m. the following day.

41.     On Friday, October 12, 2018, near the end of a twelve-hour shift, Lohmeier began handing off responsibility to James Irving ("Irving") by reporting all the patient information the new nurse needed to start the shift.

42.     While reporting to Irving, Lohmeier overheard another nurse, Caroline Wojack ("Wojack"), asking nurses if they pulled morphine that day.

43.     Wojack interrupted Lohmeier's report to Irving, to ask if she pulled morphine.

44.     None of Lohmeier's patients required morphine, so she had not dealt with that medication during her shift.

45.     Lohmeier responded that she had not pulled any morphine that day.

46.     Lohmeier was confused and momentarily distracted by Wojack's interruption.

47.     If narcotics had gone missing while Wojack was logged into the PYXIS, Wojack should have immediately reported the discrepancy to the supervisor.

48.     Lohmeier did not understand why Wojack was disregarding protocol and running around asking if anyone had the missing medication.

49.     Lohmeier continued the hand off procedures with Irving.

50.     A few minutes later, Alana Saccameno ("Saccameno"), a nursing supervisor, and Megan Daniels ("Daniels"), the permanent charge nurse, approached Lohmeier at the nurses' station.

51.     They did not ask any questions but informed Lohmeier that she needed to take a drug test.

52.     Upon information and belief, Wojack was not asked to take a drug test on October 12, 2018.

53.     Wojack who was signed in when the medication went missing and failed to follow protocol was not subjected to a drug test on October 12, 2018.

54.     Lohmeier asked why a drug test was necessary.

55.     Saccameno and Daniels informed Lohmeier that there were reports that she was acting unusually and there was morphine missing from the PYXIS—the cabinet that stores controlled medications.

56.     To access drugs in the PYXIS, nurses scan an ID to enter the room and then scan their fingerprint to open the PYXIS. Nurses logout by clicking a button on the touchscreen when they close the PYXIS. Logging out of the PYXIS caused the cabinet to immediately lock. Upon information and belief, if a nurse forgets to logout, the PYXIS may remain unlocked for a short period of time, approximately two minutes.

57.     It is standard protocol to logout of the PYXIS before leaving the secured room.

58.     Lohmeier consented to the drug test. Lohmeier informed Saccameno and Daniels that she took a Norco the night before to ease her shingles pain.

59.     Both Saccameno and Daniels assured Lohmeier that the drug test could distinguish between Norco and morphine and would detect the approximate time the medication was taken.

60.     Saccameno and Daniels asked Lohmeier to provide her prescription history, which Lohmeier sent by email later than night.

61.     It did not cross Lohmeier's mind that Saccameno and Daniels suspected she was involved with the missing medication.

62.     Lohmeier went to the Gottlieb Emergency Department with Saccameno for testing.

63.     While Lohmeier was waiting in the Emergency Department, Saccameno received a phone call or text message.  Saccameno informed Lohmeier that fentanyl had just gone missing from the PYXIS under Russell Zalas' ("Zalas") ID.

64.     Upon information and belief, Zalas was not asked to take a drug test on October 12, 2018.

65.     Saccameno said, "don't worry; it could not have been you because I was watching you."

66.     The drug testing involved a urine and blood test.

67.     With respect to the urine test, Lohmeier was given a cup which was not labeled. After providing the sample, no one was available to collect the sample.

68.     Lohmeier walked around and found someone who instructed her to put the unmarked and unsecured cup on the open counter.

69.     Lohmeier was concerned because no label was affixed to the cup, the lid was not sealed, and she was not asked to sign anything to provide consent or confirm the chain of custody.

70.     At the end of the drug test, Dr. Julie Ball, the doctor performing the testing, confirmed that Lohmeier's gate and coordination were fine.

71.    Lohmeier's pupils were active, responsive to light, and normal.

72.    The doctor confirmed Lohmeier seemed normal and was able to drive herself home.

73.    Lohmeier waited in the Emergency Department. When Saccameno returned, she instructed Lohmeier to go upstairs and finish her charts.

74.    By this time, it was nearly 10:00 p.m.

75.    Lohmeier tried to finish her charts, but was physically, mentally, and emotionally exhausted.

76.    One of the night nurses noticed Lohmeier and what was going on, Lohmeier explained the situation and became upset.

77.    Lohmeier contacted Saccameno to ask permission to leave work.

78.    Lohmeier met Saccameno in the administrative office.

79.    Lohmeier's next shift was scheduled for Monday; however, Saccameno instructed Lohmeier she should not come into work on Monday. Someone would contact her over the weekend to provide further information and instructions.

80.    Lohmeier returned to her unit to collect her belongings and left work after 10:00 p.m.—more than 15 hours after her shift began.

81.    Lohmeier drove herself home.

82.    When she arrived home, Lohmeier immediately sent Daniels an after-visit summary from Lohmeier's doctor's office that lists acetaminophen-hydrocodone 325-7.5 as a current medication to be taken 1-2 tablets every 6 hours as needed.

83.    Lohmeier believed she had followed all procedures, policies, and protocols.

84.     She did not take any narcotics unlawfully. She did not ingest any narcotics while on the job.

85.     She took a six-hour dose of a lawfully prescribed medication more than seven hours before her shift.

86.     Monday morning, October 15, 2018, Lauren Farina ("Farina"), a social worker with the employee assistance program, called Lohmeier and said she was suspended without pay subject to a Fitness for Duty assessment, which would include a substance abuse assessment.

87.     Lohmeier agreed to undergo the Fitness for Duty assessment through a third-party provider.

88.     Farina instructed Lohmeier to attend a meeting in Loyola's Human Resources Department on Tuesday, October 16, 2018, with Farina, as well security and human resources personnel.

89.     Apparently, Lohmeier needed to be interviewed as part of the investigation into the missing medications.

90.     Lohmeier was cooperative and willingly participated in the investigation.

91.     Lohmeier returned to work on Tuesday and was subjected to an hour-and-a-half long interrogation by Noel Kirk ("Kirk") (the Human Resources Manager), Daniels, two security representatives, and the Manager of the Intensive Care Unit ("ICU").

92.     The security manager led the meeting by asking questions.

93.     Lohmeier felt the security manager was trying to intimidate her.

94.     Lohmeier was interrogated about why she entered the medication room at issue.

95.     The security manager claimed Lohmeier entered the medication room in close proximity to the medication going missing.

96.     On October 12, 2018, Lohmeier's patients were in rooms across the hall from the supply room.

97.     The supply room contains general supplies in addition to the medications in the PYXIS cabinet.

98.     Lohmeier entered the supply room on October 12, 2018, using her ID badge, a few times throughout the day to gather what she needed for her patients.

99.     Lohmeier explained that near the end of her October 12, 2018 shift, she entered the room, using her ID proxy card, to find labeling stickers for maintenance that were needed for the end of shift transition.

100.    Earlier in the day, Lohmeier entered the room to gather saline flushes and other standard supplies.

101.    Lohmeier recalls walking into the supply room while Wojack was pulling medications. Lohmeier and Wojack chatted for a few moments. Lohmeier gathered the flushes she needed and noted there were no labeling stickers in the supply room, Lohmeier exited the supply room shortly after Wojack.

102.    Lohmeier also explained that the door to this supply closet is slow to close. Oftentimes, people grab the door before it is shut and enter without scanning their badge.

103.    The second security representative took notes during the meeting.

104.    Upon information and belief, based on those notes, a written statement was drafted.

105.     Lohmeier was not given an opportunity to review, revise, or confirm the written statement.

106.     Lohmeier asked if she needed to complete an inpatient substance abuse assessment, including hair follicle testing.

107.     Lohmeier was told that would not be necessary.

108.     At the end of the meeting, Kirk asked Lohmeier to write her own statement.

109.     Lohmeier wrote her statement and sent it to Kirk within a few days of the meeting.

110.     Lohmeier returned home and waited for an update.

111.     On or around October 18, 2018, Lohmeier met with her primary care physician about her mental well-being due to the stress of the suspension and investigation.

112.     Lohmeier's primary physician prescribed anti-depressants and instructed Lohmeier to see a psychiatrist.

113.     Lohmeier contacted Farina and gave consent to share any information regarding her medical history and care to assist with the investigation.

114.     Farina emailed Lohmeier that the "psychiatrist can also make recommendations regarding your readiness to return to work, and any accommodation you may need."

115.     At this time, Lohmeier informed Farina that she was scheduled to see a psychiatrist on October 25, 2019.

116.     Lohmeier inquired about FMLA leave.

117.     Wanting to assist with the investigation and get back to work as quickly as possible, Lohmeier scheduled a substance abuse assessment for October 29, 2018.

118.    On October 24, 2019, Farina and Kirk discussed the substance abuse assessment, and Kirk advised Lohmeier that the assessment was not necessary.

119.    On October 25, 2018, Kirk provided Lohmeier with FMLA forms and claimed a notice of eligibility would be mailed to her home.

120.    Lohmeier never received the notice of FMLA eligibility.

121.    On October 26, 2018, Lohmeier advised Farina that Lohmeier met with a psychiatrist and consented to releasing information with Farina, per her request.

122.    Lohmeier also provided employee health a copy of a document from her pharmacy reflecting her recently filled prescriptions.

123.    On October 30, 2018, Lohmeier asks Farina about the process for her fitness for duty evaluation.

124.    Lohmeier did not know what else she could do to get back to work when she had provided all requested information and Farina stated that a substance abuse assessment was not necessary.

125.    Farina replied that whether a substance abuse assessment is necessary will be determined after the final results of the urine test are reviewed.

126.    The following day, October 31, 2018, Farina informed Lohmeier that the MRO determined the opiates in her urine could be from the prescribed opiate for her shingles pain.

127.    There were no signs or indicia of morphine or fentanyl in Lohmeier's drug testing results.

128.    Farina informed Lohmeier that Farina would contact the psychiatrist.

129.     Lohmeier signed another release so that Farina could gather information from the psychiatrist.

130.     Later that day, Kirk and a nurse from employee health called Lohmeier.

131.     Kirk claimed that Wojack recently reported that two and a half weeks earlier, Wojack asked Lohmeier for assistance with an NG—a procedure during which an NG tube is inserted in the patient's nose.

132.     Wojack claimed Lohmeier inserted the tube incorrectly, she instructed Lohmeier to stop, and Lohmeier cursed and left the room.

133.     Wojack's report was false and unsupported.

134.     Lohmeier did not assist Wojack with an NG tube on October 12, 2018 or on any other day.

135.     Kirk did not say whether there were any other witnesses or whether there was any evidence that the patient was injured.

136.     The charge nurse for October 2018, Sharon Brace ("Brace"), stated that Wojack did not report the alleged incident.

137.     Brace had no knowledge of any incident involving Lohmeier.

138.     Lohmeier informed Kirk the report was false.

139.     Kirk asked Lohmeier to attend another meeting in Loyola's Human Resources Department on Friday, November 2, 2018.

140.     On Thursday, November 1, 2018, Lohmeier informed Kirk that she submitted all FMLA documents.

141.     On Friday, November 2, 2018, Lohmeier met with Kirk, Ginger Hook (the Chief Nursing Officer), and the ICU Manager.

142.     During the meeting, Defendants terminated Lohmeier.

143.     Kirk informed Lohmeier that nothing was done with her FMLA forms.

144.     Upon information and belief, neither Wojack nor Zalas were drug tested, suspended, or investigated on October 12, 2018, when narcotics went missing under their PYXIS login credentials.

145.     On November 6, 2018, Lohmeier submitted an employee complaint and grievance to Dianne Zimmerman in the legal department.

146.     In her grievance, Lohmeier wrote:

I believe I provided a convenient scapegoat for this incident. I was targeted and the only reason I can think of is racial discrimination. Everyone else involved is Caucasian; I am the only person of color. Why was I the only person tested when there was plenty of reason for others to be drug tested? Why was I the only person suspended and banned from speaking with anyone on the unit? Two people who actually did break a protocol were given a free pass in this investigation and were not drug tested.

147.     Lohmeier also wrote:

It is also my belief that I was deemed guilty much sooner than when the investigation concluded for the following reasons: . . . I requested FMLA which Noel Kirk delayed but eventually sent me the forms. However, I never received the eligibility letter that was supposed to be sent out when an employee requests FMLA documents. Additionally, I did submit the forms with my doctor's signature. The day I was terminated, Noel informed me that they did receive the forms but "didn't do anything with them" yet so they wouldn't be processed.

148.     On November 13, 2018, Hook filed a RN/LPN Intoxication and Drug Use Nursing Mandatory Report against Lohmeier with the Illinois Department of Financial and Professional Regulation regarding "two occurrences of narcotic waste discrepancies involving two other nurses" and stating Gottlieb believed "diversion ha[d] occurred and patient safety was at risk."

149.     On November 16, 2018, Lohmeier had not received her final paid-time-off payment. Lohmeier submitted a request for this payment to Kirk.

11420457.2

150.    Per the internal grievance procedure, Lohmeier did not receive a response to her grievance within twelve days.

151.    Lohmeier escalated the grievance process to step two.

152.    After 21 days, Lohmeier did not receive a response to her step two grievance, so she contacted Helen Moore, the human resources manager.

153.    On December 21, 2018, Hook responded by rejecting Lohmeier's grievance.

154.    Hook upheld the termination despite "no prior discipline in [Lohmeier's] file" and her "Fitness for Duty test [being] ambiguous and inconclusive . . ."

155.    Lohmeier requested an escalation to the step three grievance process.

156.    Lohmeier received her step three packet on January 9, 2019 and identified her panel selections the following day.

157.    Human Resources scheduled a panel hearing for February 6, 2019.

158.    Lohmeier did not receive a response within the 21-day allotted time for panel responses.

159.    On March 12, 2019, Lohmeier received a response by regular mail.

160.    During the internal administrative process, Lohmeier submitted a statement that she filed her grievance to clear her name and have her status as "terminated/not re-hirable" changed to "voluntary resignation/hirable."

161.    The final response dated, February 28, 2019, sustained the decision to terminate Lohmeier and categorize it as "involuntary, ineligible for rehire."

162.    On August 27, 2019, Lohmeier filed her charge of discrimination with the Illinois Department of Human Rights and U.S. Equal Employment Opportunity Commission.

163.    Lohmeier received a right to sue letter from the U.S. Equal Employment Opportunity Commission on September 16, 2019. A copy of the EEOC Charge and Right to Sue Letter are attached hereto as **Exhibit 1**.

<u>**COUNT I**</u>
<u>**Violation of Title VII of the Civil Rights Act of 1964**</u>

164.    Lohmeier incorporates paragraphs 1 through 163 as though fully stated herein.

165.    At all times material to this Complaint, Gottlieb and Loyola were employers within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

166.    Gottlieb and Loyola discriminated against Lohmeier on the basis of her color (dark-skinned Latina), in violation of § 2000e-2.

167.    Similarly-situated Caucasian employees at Gottlieb and Loyola did not receive the same treatment as Lohmeier.

168.    Gottlieb and Loyola created a hostile working environment for Lohmeier due to Lohmeier's color, dark-skinned Latina.

169.    Gottlieb and Loyola's violations of Lohmeier's rights under Title VII caused her significant emotional, physical, and monetary harm.

170.    Gottlieb and Loyola's violations of Lohmeier's rights under Title VII were willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

11420457.2

(i)     all back pay lost as a result of Gottlieb's and Loyola's discrimination;

(ii)    front pay;

(iii)   compensatory damages;

(iv)   punitive damages;

(v)    her attorneys' fees and costs; and

(vi)   such other and further relief as this Court deems just and proper under the circumstances.

## COUNT II
### Violation of Title VII of the Civil Rights Act of 1964

171.    Lohmeier incorporates paragraphs 1 through 163 as though fully stated herein.

172.    At all times material to this Complaint, Gottlieb and Loyola were employers within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

173.    Gottlieb and Loyola discriminated against Lohmeier on the basis of her national origin, Salvadoran, in violation of § 2000e-2.

174.    Similarly-situated employees not of Salvadoran origin at Gottlieb and Loyola did not receive the same treatment as Lohmeier.

175.    Gottlieb and Loyola created a hostile working environment for Lohmeier due to Lohmeier's national origin, Salvadoran.

176.    Gottlieb and Loyola's violations of Lohmeier's rights under Title VII caused her significant emotional, physical, and monetary harm.

177.    Gottlieb and Loyola's violations of Lohmeier's rights under Title VII were willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

18

(i)  all back pay lost as a result of Gottlieb's and Loyola's discrimination;

(ii)  front pay;

(iii)  compensatory damages;

(iv)  punitive damages;

(v)  her attorneys' fees and costs; and

(vi)  such other and further relief as this Court deems just and proper under the circumstances.

## COUNT III
### Violation of Title VII of the Civil Rights Act of 1964

178.  Lohmeier incorporates paragraphs 1 through 163 as though fully stated herein.

179.  At all times material to this Complaint, Gottlieb and Loyola were employers within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

180.  Gottlieb and Loyola illegally retaliated against Lohmeier for exercising her rights under Title VII.

181.  Similarly-situated Caucasian employees at Gottlieb and/or Loyola who did not exercise their rights under Title VII at Gottlieb did not receive the same treatment as Lohmeier.

182.  Similarly-situated employees not of Salvadoran origin at Gottlieb and/or Loyola who did not exercise their rights under Title VII did not receive the same treatment as Lohmeier.

183.  Gottlieb and Loyola's illegal retaliation against Lohmeier caused her significant emotional, physical, and monetary harm.

184.  Gottlieb and Loyola's illegal retaliation against Lohmeier was willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

11420457.2

    (i)     all back pay lost as a result of Gottlieb's and Loyola's retaliation;;

    (ii)    front pay;

    (iii)   compensatory damages;

    (iv)   punitive damages;

    (v)    her attorneys' fees and costs; and

    (vi)   such other and further relief as this Court deems just and proper under the circumstances.

## COUNT IV
## Violation of the Americans with Disabilities Act

185.    Lohmeier incorporates paragraphs 1 through 163 as though fully stated herein.

186.    Lohmeier is an individual with a disability (recovering from shingles and receiving treatment for mental health) within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

187.    Lohmeier was qualified for her nursing position at Gottlieb and able to perform the essential functions of her position with or without reasonable accommodation.

188.    Lohmeier was subject to an adverse employment action.

189.    The circumstances surrounding the adverse action indicate that it is more likely than not that her disability was the reason for the adverse employment action.

190.    Gottlieb and Loyola's violations of Lohmeier's rights under the ADA were willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

    (i)     all back pay lost as a result of Gottlieb's and Loyola's discrimination;

    (ii)    front pay;

    (iii)   compensatory damages;

    (iv)   punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

## COUNT V
## Violation of the Americans with Disabilities Act

191.    Lohmeier incorporates paragraphs 1-163 as though fully stated herein.

192.    Lohmeier is an individual with a disability (recovering from shingles and receiving treatment for mental health) within the meaning of the ADA, 42 U.S.C. § 12101, *et seq*.

193.    Lohmeier advised her employer of her condition and requested an accommodation.

194.    In working with Lohmeier's psychiatrist and treating physician there were accommodations available that would have been effective and would not have posed an undue hardship on Gottlieb or Loyola.

195.    Gottlieb and Loyola failed to provide Lohmeier with an accommodation.

196.    Gottlieb and Loyola's violations of Lohmeier's rights under the ADA were willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of Gottlieb's and Loyola's failure to accommodate;

(ii)    front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

## COUNT VI
## Violation of the Family Medical Leave Act

197.     Lohmeier incorporates paragraphs 1-163 as though fully stated herein.

198.     Lohmeier was eligible for the FMLA's protections, 29 U.S.C. 2601, et seq.

199.     Gottlieb and Loyola are covered by the FMLA.

200.     Lohmeier provided sufficient notice of her intent to take leave.

201.     Gottlieb and/or Loyola denied Lohmeier FMLA benefits to which she is entitled.

202.     Gottlieb and Loyola's interference with Lohmeier's FMLA rights was willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of Gottlieb's and Loyola's interference with Lohmeier's FMLA rights;

(ii)     front pay;

(iii)     liquidated damages;

(iv)     compensatory damages;

(v)     punitive damages;

(vi)     her attorneys' fees and costs; and

(vii)     such other and further relief as this Court deems just and proper under the circumstances.

## COUNT VII
## Violation of the Family Medical Leave Act: Retaliation

203.     Lohmeier incorporates paragraphs 1-163 as though fully stated herein.

204.     Lohmeier engaged in protected activity under the FMLA, 29 U.S.C. 2601, et seq.

205.     Gottlieb and Loyola took an adverse employment action against Lohmeier in retaliation for her FMLA protected activity.

11420457.2

206.     There is a causal connection between the protected activity and the adverse employment action.

207.     Gottlieb and Loyola's retaliation against Lohmeier was willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

      (i)     all back pay lost as a result of Gottlieb's and Loyola's retaliation against Lohmeier for exercising her rights under the FMLA;

      (ii)    front pay;

      (iii)   compensatory damages;

      (iv)   punitive damages;

      (v)    liquidated damages;

      (vi)   her attorneys' fees and costs; and

      (vii)  such other and further relief as this Court deems just and proper under the circumstances.

## COUNT VIII
## Violation of the Illinois Human Rights Act

208.     Lohmeier incorporates paragraphs 1-163 as if fully restated herein

209.     At all times material to this Complaint, Gottlieb and Loyola were employers within the meaning of the Illinois Human Rights Act, §2-101(B)(1)(a), and employed more than the statutory minimum of fifteen employees.

210.     Gottlieb and Loyola discriminated against Lohmeier on the basis of her color (dark-skinned Latina), national-origin (Salvadoran), and status as a qualified individual with a disability (recovering from shingles and receiving treatment for mental health) in violation of the Illinois Human Rights Act.

23

211. Similarly situated Caucasian employees at Gottlieb and Loyola did not receive the same treatment as Lohmeier.

212. Similarly situated employees not of Salvadoran national origin at Gottlieb and Loyola did not receive the same treatment as Lohmeier.

213. Similarly situated employees without a disability did not receive the same treatment as Lohmeier.

214. Gottlieb and Loyola created a hostile work environment for Lohmeier due to her color, dark-skinned Latina.

215. Gottlieb and Loyola created a hostile work environment for Lohmeier due to her national origin, Salvadoran.

216. Gottlieb and Loyola created a hostile work environment for Lohmeier due to her status as a qualified individual with a disability.

217. Gottlieb and Loyola retaliated against Lohmeier for exercising her rights in violation of the Illinois Human Rights Act, §6-101(A).

218. Gottlieb and Loyola retaliated against Lohmeier in violation of the Illinois Human Rights Act and caused her significant emotional and monetary harm.

219. Gottlieb and Loyola's violations of the Illinois Human Rights Act were willful.

WHEREFORE, Plaintiff, Wendy Lohmeier, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendants, Gottlieb Memorial Hospital and Loyola University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of Gottlieb's and Loyola's discrimination and against Lohmeier;

(ii)    front pay;

(iii)   compensatory damages;

    (iv)     punitive damages;

    (v)      her attorneys' fees and costs; and

    (vi)     such other and further relief as this Court deems just and proper under the circumstances.

Dated: December 12, 2019          Respectfully submitted,


                            */s/ Peter M. Katsaros*
                            Peter M. Katsaros
                            Gillian G. Lindsay
                            HAHN LOESER & PARKS LLP
                            200 W. Madison Street, Suite 2700
                            Chicago, IL 60606
                            (312) 637 - 3015
                            pkatsaros@hahnlaw.com
                            glindsay@hahnlaw.com

                            *Attorneys for Wendy Lohmeier*