**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WENDY LOHMEIER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-8136 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| GOTTLIEB MEMORIAL HOSPITAL and | ) | |
| LOYOLA UNIVERSITY MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**<u>MEMORANDUM OPINION AND ORDER</u>**

Fentanyl and morphine mysteriously went missing from a dispensing machine on the ICU floor of Gottlieb Memorial Hospital. Twice on the same day, someone used the credentials of other employees and extracted narcotics without authorization. The Hospital opened an investigation.

The Hospital figured out that Wendy Lohmeier, an ICU nurse, was on duty that day, and she was in the room right around the time when the drugs disappeared. Worse yet, Lohmeier exhibited signs that she had something in her system. Several employees noticed that she seemed droopy and drowsy, with slurred speech. And sure enough, later that night, she tested positive for having opioids in her system. It was the equivalent of finding an empty cookie jar, and then spotting a kid with melted chocolate on her mouth.

The Hospital put two and two together, and fired her. Lohmeier responded by filing this lawsuit against the Hospital and Loyola University Medical Center, bringing a slew of discrimination claims. She claims that the Hospital got it all wrong, and that she was simply exhibiting signs of medication for shingles.

After extensive discovery, Defendants moved for summary judgment.  For the reasons stated below, the motion for summary judgment is granted.

## Background

This case has the distinct feel of a Scooby-Doo-level, whodunnit mystery in the making.  But before diving into the facts, the Court gives one reminder and makes one observation.

The question in this case is not whether Lohmeier took the narcotics.  That is, the question is not whether there is a genuine issue of material fact about who swiped the medication.  Instead, the question is whether a reasonable jury could find that the Hospital discriminated against Lohmeier and otherwise violated federal law.

So, as tempting as it might be to put on your Sherlock Holmes hat, solving the game of Clue isn't exactly the task at hand.

Along the way, the Court feels compelled to make an observation about Lohmeier's response to Defendants' statement of facts.  Lohmeier went overboard when responding to Defendants' statement of facts, larding the response with a slew of objections, caveats, clarifications, disclaimers, and nitpicks.  Almost no proposed fact went unscathed.  By and large, the objections were substantial in number, but insubstantial in content.  Like Styrofoam peanuts, they were high in volume, and low in weight.

Consider a few examples.  Lohmeier repeatedly objected that testimony was self-serving, even though that is not an objection.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 13, 18–19, 21, 44, 48, 57–58, 60, 67 (Dckt. No. 99); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (reiterating that a party cannot "denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment" by calling it "self serving").  Lots of testimony is self-serving.

Plenty of other examples jump off the page. Lohmeier objected that the medical staff made improper lay opinions when they made run-of-the-mill observations about her condition, like the fact that she seemed drowsy or impaired. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 23, 26, 31, 32, 46 (Dckt. No. 99). It doesn't take an expert to see that someone looks sleepy.

In response to other evidence, Lohmeier commented that the staff behaved in an unprofessional manner, which makes no difference from an evidentiary standpoint. *Id.* at ¶¶ 22, 29, 43. Also, Lohmeier pointed out that sworn testimony was otherwise unsubstantiated. *Id.* at ¶¶ 18–19, 67. But testimony is admissible even without documentary back-up. As a final example, Lohmeier complained that certain documents were not produced in discovery, but that ship has sailed. *Id.* at ¶¶ 14, 19, 21, 28, 47, 57.

And so on. The volume of objections, caveats, and disclaimers made things more cumbersome. But at the end of the day, they do not change the result. Cutting through the noise, one conclusion jumps out: no reasonable jury could decide this case in Lohmeier's favor.

With that wind-up, the Court turns to the facts of the case.

In February 2018, Gottlieb Memorial Hospital needed another "Critical Care Nurse" for its ICU patients. *Id.* at ¶ 4. Registered Nurse Wendy Lohmeier interviewed, and got the job. *Id.* at ¶¶ 3–4.

The Hospital has a Drug Abuse Policy. *Id.* at ¶ 6. "[I]t is the responsibility of each employee to be fit for duty." *Id.* at ¶ 7. The Hospital prohibits its employees from being "under the influence of any amount of mood altering substance" on Hospital premises during working hours. *Id.*

The Hospital's Drug Free Workplace Policy requires employees to notify their superiors if they are taking prescription drugs that might affect their job performance. *Id.* at ¶ 7 n.3. If "an

employee is using prescription drugs as part of a medical treatment program, the employee must notify his or her supervisor if such medication could affect job performance and/or safety." *Id.*

Lohmeier reviewed the policies during her orientation. *Id.* at ¶ 6. And she got to work.

In July 2018, Lohmeier came down with shingles. *Id.* at ¶¶ 4, 10. Shingles is a skin condition that causes a red, angry, blistery rash. It can be quite painful. The chickenpox virus is the culprit.

Lohmeier requested time off under the Family and Medical Leave Act ("FMLA"). *Id.* at ¶ 11. The Hospital approved her request. *Id.* Lohmeier was on leave from July 25, 2018, until August 8, 2018. *Id.*

In the meantime, a doctor prescribed Norco – an opioid – to control Lohmeier's pain. *Id.* at ¶¶ 10, 12.

The doctor also warned Lohmeier that shingles can trigger nerve pain flare-ups that endure for months. *Id.* at ¶ 12. So, the doctor told Lohmeier to dull her pain with Norco when Tylenol wasn't cutting it. *Id.*

Two weeks after she started leave, Lohmeier came back to work without restriction. *Id.* at ¶ 11. But months later, Lohmeier struggled to fall asleep. *Id.* at ¶ 12. On October 11, 2018, she took a Norco pill to help. *Id.*

The next morning – October 12, 2018 – Lohmeier showed up for work for the 7:00 a.m. shift. *Id.* Lohmeier testified that she was tired, but otherwise ready for work. *Id.* She testified that Norco did not affect her job performance after taking it, so she did not notify her supervisor that she had taken an opioid the night before work. *Id.*

4

The ICU distributes narcotics through a so-called Pyxis machine.  *Id.* at ¶ 16.  The ICU has only one Pyxis machine.  *Id.*  It holds dangerous controlled substances, including fentanyl and morphine.  *Id.* at ¶¶ 21, 29.

As the Court understands things, a Pyxis machine is something like a vending machine.  *Id.* at ¶ 17.  But instead of grabbing Snickers bars, nurses get narcotics for their patients.  *Id.*

Based on this Court's review, a Pyxis machine looks something like a waist-high cabinet, in drab grey, with a keyboard, a scanner, and a touchscreen on top.[1]  The cabinet keeps the narcotics in secure drawers, with compartments full of medicine.  Frankly, it looks more like a tool cabinet from Home Depot than a vending machine.  The exterior is solid and opaque (not glass), so until each drawer opens, the drugs aren't visible.

As you might expect, the machine is secure.  The machine requires two layers of identification before giving the person access to the narcotics.  A nurse must enter her user ID, and scan her fingerprint, before the drawers will open.  *Id.*  The machine keeps detailed records of what medicines are pulled, when, and by whom.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at 1–2 of 69 (Dckt. No. 103).

There is another layer of security, too.  Employees must swipe their badge to unlock the room that stores the machine.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 99).  They can't get in the door without swiping in.

---

[1]  YouTube offers plenty of examples.  *See, e.g.*, Medical Shipment, *Pyxis MedStation ES System Overview*, YouTube (Apr. 24, 2020), https://www.youtube.com/watch?v=DHhBtujpMQ4; UAMS, *Pyxis Machine Tutorial*, YouTube (Sept. 25, 2020), https://www.youtube.com/watch?v=3pUiSoKW-6w; Mabuhay RN, *Getting Started with Pyxis*, YouTube (Sept. 2, 2023), https://www.youtube.com/watch?v=QJxM4OxoifQ.

A nurse is supposed to log out from the Pyxis machine when he or she is done. *Id.* at ¶ 28. If the nurse fails to log out, the machine will automatically sign out the user after a minute or two. *Id.* at ¶ 18. There is also a delay of three to five seconds between a nurse signing out and the machine shutting off. *Id.*

The gaps in time provide windows of opportunity. If a nurse forgot to log out, and left the room, someone else would have a minute or two to extract medicine using that person's credentials. Also, if a person did sign out, another person would have three or five seconds to jump in and put a halt to the log out. *Id.*

The case involves the disappearance of narcotics from the Pyxis machine on October 12. Lohmeier was working in the ICU that day, and so were other members of the medical staff.

That afternoon, at 3:20:26 p.m., Nurse Caroline Wolak pulled insulin from the Pyxis machine. *Id.* at ¶ 14. She wasn't alone. Wolak and Lohmeier were in the room together. *Id.* at ¶ 20. Wolak left. *Id.* Lohmeier says that she exited five seconds after Wolak. *Id.*

Lohmeier didn't go far. At 3:22:49 p.m., Lohmeier scanned into the locker room. *Id.* at ¶ 14. The locker room is near the room with the Pyxis machine. *Id.* at ¶ 15.

A few hours later, around 6:00 p.m., Wolak went back to the Pyxis machine and made a startling discovery. *Id.* at ¶ 21. The machine's history reflected that someone had pulled morphine from the machine, and did so under Wolak's credentials. *Id.*

But Wolak says that it was not her. *Id.* The discrepancy made Wolak "very upset." *Id.* at ¶ 22. She asked around. *Id.* Every nurse on the floor – including Lohmeier – denied getting morphine. *Id.*

Wolak believed that Lohmeier denied it strangely. *Id.* at ¶ 23. Wolak thought that Lohmeier responded slowly, avoided eye contact, struggled to keep her eyes open, and slurred her speech. *Id.*

At roughly 6:30 p.m., Wolak told Charge Nurse Megan Daniels that morphine had vanished under her username. *Id.* at ¶ 30.

Daniels investigated. *Id.* at ¶ 31. She asked ICU staff if they had pulled the medication. *Id.* Certified Nursing Assistant Weronika Brzezinska told Daniels that Lohmeier did not look well. *Id.*

Daniels approached Lohmeier. *Id.* at ¶ 32. Lohmeier "had her head down" on a desk. *Id.* According to Daniels, Lohmeier "looked up." *See* Daniels Dep., at 26:13 (Dckt. No. 99-10). But her eyes were "half opened" and she "kind of made" a "groaning" noise. *Id.* at 26:13-16.

Daniels left and called Nursing Supervisor Alana Saccameno. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 99). At about 6:45 p.m., Saccameno and Daniels met in person and discussed the missing medication. *Id.*

Then they talked to Lohmeier. *Id.* at ¶ 34. Lohmeier remembers the conversation happening sometime between 7:00 p.m. and 7:30 p.m.[2] *Id.*

---

[2] The Court candidly is not certain about the exact chronology when it comes to the meeting among Saccameno, Daniels, and Lohmeier (on the one hand) and Lohmeier's second entrance into the room with the Pyxis machine (on the other). Lohmeier testified that the meeting took place sometime between 7:00 p.m. and 7:30 p.m. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 99). After that meeting, Saccameno escorted Lohmeier to the emergency room, and it appears that she stayed there for a few hours. *Id.* at ¶¶ 34–35. But the security badge report showed that Lohmeier entered the medication room – where the Pyxis machine is located – at 7:42:08 p.m. *Id.* at ¶ 49. Maybe the true chronology was the other way around. That is, maybe Lohmeier went into the medication room at 7:42:08 p.m., and *then* talked to Saccameno and Daniels. It seems unlikely that Lohmeier would talk with her supervisors about missing medication, and then get escorted to the emergency room, and then go back to the room where the drugs went missing. She couldn't be in two places at once. But at the end of the day, the exact chronology is immaterial. Lohmeier admits going into the room with the Pyxis machine at the relevant time, meaning 7:42 p.m. *See* Pl.'s Statement of Additional Facts, at ¶ 13 (Dckt. No. 100).

Meanwhile, at around 7:00 p.m., night-shift nurse James Irving reported for duty. *Id.* at ¶ 24. Irving and Lohmeier talked. *Id.* at ¶ 25. Lohmeier needed to transfer a patient into Irving's care for the night. *Id.*

Irving thought that Lohmeier acted "unusual." *See* Irving Dep., at 23:3-8 (Dckt. No. 99-11). Lohmeier frequently paused and seemed lost in thought. *Id.* at 23:17-22.

Nurse Russel Zalas showed up for the night shift at around 7:00 p.m., too. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 99). Soon after, Zalas got morphine from the Pyxis machine for a patient. *Id.*

And then the missing-medicine mystery happened again.

At some point that evening (the record does not reveal exactly when), Zalas went back to the machine. *Id.* at ¶ 29. The machine reflected that someone withdrew fentanyl under his name. *Id.* But Zalas testified that he did not pull any fentanyl. *Id.*

Reports later showed that an unidentified user (denoted as "Nursing, ICU") scanned into the equipment room at 7:41:29 p.m. *Id.* at ¶ 49. Someone pulled fentanyl under Zalas's credentials at 7:41:44 p.m. *Id.* at ¶¶ 43, 49. And the time stamps show that Lohmeier scanned into the equipment room at 7:42:08 p.m. *Id.* at ¶ 49. (More on the timing discrepancy, later).

Taking a step back, the Court needs to say a word about what happened during the conversation among Saccameno, Daniels, and Lohmeier. Remember, Lohmeier recalls that the conversation happened between 7:00 p.m. and 7:30 p.m.

The conversation did not ease Saccameno's concerns. Saccameno testified that Lohmeier's response was slow, deliberate, and slurred. *Id.* at ¶ 34. So, Saccameno asked Lohmeier to take a fitness for duty exam in the emergency room. *Id.* at ¶ 35. Lohmeier agreed. *Id.* Lohmeier revealed that she had taken Norco the night before. *Id.*

Saccameno escorted Lohmeier to the emergency room.  *Id.* at ¶¶ 34–35.[3]  Emergency room nurse Martha Amas examined Lohmeier.  *Id.* at ¶ 37.  In an email to Saccameno the next morning, Amas stated that Lohmeier appeared  "intoxicated with slurred speech, slow reaction time, bloodshot eyes, droopy eyelids, and a misstep in her gait."  *Id.*

Around 8:30 p.m., emergency room doctor Julieanne Ball evaluated Lohmeier.  *Id.* at ¶ 38.  Dr. Ball observed that Lohmeier had a "slow response and glazed and sluggish eyes."  *Id.* Dr. Ball also asked Lohmeier to take a drug and alcohol test.  *Id.*  Lohmeier agreed.  *Id.*

Back on the ICU floor, Nurse Zalas called Daniels at around 9:00 p.m.  *Id.* at ¶ 43.  Zalas told Daniels that someone had taken fentanyl from the Pyxis machine under his username.  *Id.*

At some point that evening, the results of Lohmeier's alcohol test came back.  (The results of the drug test came back days later.)  The alcohol test was negative, and Dr. Ball let Lohmeier leave.  *Id.* at ¶ 39.

Saccameno told Lohmeier that she shouldn't show up for shifts until further notice.  *Id.* ¶¶ 42–43.  Lohmeier left the hospital at about 10:30 p.m.  *Id.*  She drove home.  *Id.*

At some point, the drug test results came back.  The drug test revealed that opiates were in Lohmeier's system.  *Id.* at ¶ 40.  But the test did not determine the *type* of opiate in Lohmeier's blood.  *Id.*  Morphine and fentanyl are opiates, and so is Norco.  *Id.* at ¶ 41.

The Hospital's medical review officer – Dr. Joshua Evans – eventually analyzed Lohmeier's drug report.  *Id.* at ¶ 55.  He told Ginger Hook (Chief Nursing Officer and Vice President of Patient Care) that because Lohmeier had a prescription for a medication that could

---

[3]  Again, the timeline has tension.  Lohmeier recalls that Saccameno talked to her and escorted her to the emergency room between 7:00 p.m. and 7:30 p.m.  But the badge report shows that Lohmeier scanned into the equipment room at 7:42:08 p.m.  *See* Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 49 (Dckt. No. 99).  The Court notes the discrepancy.  But the discrepancy is not material to the legal issues in this case.

explain the result, the Hospital would officially classify it as negative. *See* Hook Dep., at 40:1-16 (Dckt. No. 99-15).

The weekend passed. On Monday (October 15), Hospital executives convened. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 46 (Dckt. No. 99). The group agreed that Daniels and Charge Nurse Deborah Shrewsbury should collect witness statements. *Id.* The group also planned to review the Pyxis machine and security badge reports. *Id.* So, when the meeting adjourned, the investigation targeted two issues: (1) Lohmeier's fitness for duty on October 12; and (2) whether a drug diversion occurred. *Id.*

Hook (Chief Nursing Officer) and Noel Kirk (Executive Director of Human Resources) scrutinized the Pyxis and security badge reports. *Id.* at ¶ 47. Each time, Lohmeier entered the room within 30 seconds of the drugs getting extracted. But the times didn't line up, exactly.

Specifically, the records confirmed that someone pulled morphine under Wolak's username at 3:21:20 p.m. on October 12. *Id.* at ¶ 48. The security badge report reflected that Lohmeier entered the room at 3:21:45. *Id.* That's *after* the drugs were extracted, not before.

The same thing happened the second time. Someone pulled fentanyl under Zalas's username at 7:41:44 p.m. *Id.* at ¶ 49. And the security badge report showed that Lohmeier entered the room at 7:42:08 p.m. *Id.* Again, the reports show that Lohmeier badged into the room 24 seconds *after* the drugs disappeared.

At first blush, it looks like Lohmeier entered the room *after* the drugs were extracted, not before. But in reality, it was the other way around. The record confirmed that the clocks weren't lined up. The clock at the door was a minute or two ahead of the clock on the Pyxis machine.

The record includes evidence about the disparity in time. Hook testified that the clocks "weren't perfectly synched [sic]." *Id.* at ¶ 48. That is, there was a "slight variation" between the

10

time on the security system (at the door) and the time on the Pyxis machine. *Id.* The Hospital's Rule 30(b)(6) witness testified about the time disparity, too. *Id.* at ¶ 18.

"[T]he Pyxis machine, and its accompanying report time stamps, were not synced with the security badge swipes. Rather, the Pyxis machine time stamps were running 1-2 minutes behind the security system and its accompanying security badge reports." *Id.* In other words, the clock on the Pyxis machine would show 11:58 a.m. or 11:59 a.m. at the precise moment when the clock at the door would show 12:00 noon. *Id.* at ¶¶ 18, 48.

Lohmeier does not deny that a time lag existed. *Id.* at ¶ 18. That is, Lohmeier offers no evidence to dispute the fact that the clock on the Pyxis machine ran one or two minutes behind the clock on the security system at the door. Instead, Lohmeier faults Defendants for not pinning down the "exact lag time," and she faults the Hospital for failing to explain "why this imprecision existed in the Hospital's time keeping system." *Id.*; *see also* Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 100) ("The Pyxis reports and the security badge reports were not synced on October 12, 2018.").

On October 19, while the investigation was underway, Lohmeier asked hospital social worker Lauren Farina if she could take FMLA leave. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 63 (Dckt. No. 99). Lohmeier eventually submitted an FLMA request about a week and a half later, on November 1. *Id.* at ¶ 64.

On November 2, Hook, Kirk, and Nurse Manager Tarleda Mansfeld met with Lohmeier. *Id.* at ¶ 67. The trio fired Lohmeier, citing "[p]atient safety," "behavior concerns," and the drug "diversion." *Id.* at ¶ 68; *see also* Letter, at 34 of 34 (Dckt. No. 99-15).

After, Hook submitted a Nursing Mandatory Report to the Illinois Department of Finance and Professional Regulation. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 99). The report summarized the October 12 events. *Id.*

Four days later (November 6), Lohmeier turned to the Hospital's Employee Complaint Procedure. *Id.* at ¶¶ 70–71. She filed a complaint and dropped a bombshell: she accused the Hospital of discriminating against her. *Id.* at ¶ 71; *see also* HR Cplt., at 71 of 72 (Dckt. No. 89-2) ("I was targeted and the only reason I can think of is racial discrimination.").

Eventually, Lohmeier's complaint reached grievance process "Step 3." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 76 (Dckt. No. 99). The Hospital convened a three-member panel to review Lohmeier's complaint. *Id.* Lohmeier chose one of the panel members. *Id.* The Hospital picked the other two. *Id.*

The panel held a hearing on February 6, 2019. *Id.* at ¶ 77. Lohmeier attended. *Id.* She presented her case for 10 minutes. *Id.* Then the Hospital shared its side of the story. *Id.*

About a month later, the Hospital sent Lohmeier a letter affirming the termination decision. *Id.* at ¶ 79; *see also* Letter, at 23–24 of 24 (Dckt. No. 99-17) (noting that Lohmeier created a "substantial risk to patient safety"). Lohmeier's time with the Hospital ran out.

Lohmeier sued. She accused Gottlieb and Loyola University Medical Center[4] ("the Hospital") of discrimination based on her national origin (Salvadoran), her color ("dark-skinned"), and her disability status (recovering from shingles and receiving mental health treatment). *See* Cplt., at ¶¶ 1–2 (Dckt. No. 1).

---

[4] Gottlieb Memorial Hospital is in the Loyola University Medical Center network. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 1–2 (Dckt. No. 99).

Specifically, Lohmeier brought eight claims. She alleged color discrimination (Count I), national origin discrimination (Count II), and retaliation (Count III) under Title VII. She brought a disability discrimination claim (Count IV) and a failure-to-accommodate claim (Count V) under the Americans with Disabilities Act. She also brought claims about the denial of benefits (Count VI) and retaliation (Count VII) under the FMLA. And finally, Lohmeier brought a claim under the Illinois Human Rights Act (Count VIII). *Id.* at ¶¶ 164–219.

The parties took extensive discovery. The Hospital then moved for summary judgment. *See* Mtn. for Summ. J. (Dckt. No. 87).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir.

2008).  Summary judgment is appropriate if, on the evidence provided, no reasonable jury could

return a verdict in favor of the non-movant.  *See Celotex Corp.*, 477 U.S. at 322; *Gordon v.*

*FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Court will consider the summary judgment motion in four chunks.  The Title VII

claims will come first, followed by the claims under the ADA and the FMLA.  The state law

claim under the IHRA will bat cleanup.

## I.      Title VII

Lohmeier brought three Title VII claims.  She alleged discrimination on the basis of color

(Count I) and national origin (Count II).  She also claimed retaliation (Count III).  *See* Cplt., at

¶¶ 164–84 (Dckt. No. 1).

### A.      Discrimination Claims

Title VII prohibits an employer from taking adverse action against an employee based on

race or national origin.  *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th

Cir. 2021); 42 U.S.C. § 2000e-2(a)(1).  So, this Court must decide whether a reasonable jury

could find that Lohmeier would have kept her job if she had a different race or national origin

and "everything else had remained the same."  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760,

764 (7th Cir. 2016).

Sometimes plaintiffs make their case by relying on the well-worn, multi-step circuitous

path of the *McDonnell Douglas* burden-shifting framework.  *See Wince v. CBRE, Inc.*, 66 F.4th

1033, 1040 (7th Cir. 2023).  Other times, they take the straight-shot approach and get right to

their discrimination evidence.  *Id.*; *see Ortiz*, 834 F.3d at 764.

Lohmeier takes both paths. *See* Pl.'s Resp., at 10, 12 (Dckt. No. 98). So the Court will follow her down each road. *See Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (analyzing claims under both frameworks). The Court starts with the windier route of *McDonnell Douglas*.

Here's the map. Lohmeier has the initial burden to establish a prima facie case of discrimination. *See Wince*, 66 F.4th at 1040. She must show that: (1) she is a member of a protected class; (2) she met the Hospital's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Id.*

If Lohmeier establishes a prima facie case, the burden shifts to Defendants to provide a legitimate justification. *Id.* If Defendants carry that burden, then the burden goes back to Lohmeier. *Id.* At that point, she must show that a reasonable jury could find that the justification for her termination is a pretext for discrimination. *Id.*

A few elements are not at issue. Lohmeier is a member of a protected class (prong one), and she suffered an adverse employment action (prong three). She is Salvadoran, and got fired.

This Court also will put to one side whether Lohmeier met legitimate job expectations (prong two). She denies taking the narcotics from the Pyxis machine, so there is a factual dispute about that issue.

Lohmeier admits that she had opioids in her system (*i.e.*, she says it was Norco, for shingles). Worse yet, she admits that she did not tell anyone in advance that she had taken opioids. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 99). So, Lohmeier took an opioid, and then went to work in an ICU – without telling anyone.

Putting those facts together, maybe Lohmeier did not meet legitimate job expectations. The policy imposed a notice requirement if an employee took medication that might affect her performance. "[E]mployees on medication must notify their supervisor if such medication could affect job performance and/or safety." *Id.* at ¶ 8. The policy also prohibited employees from being impaired at work. *Id.* at ¶¶ 7–8.

There is lots of testimony that Lohmeier was impaired at work. On the flipside, there does not appear to be much evidence on the other side of the ledger. But there is some. At deposition, Lohmeier testified that she was not impaired at work. *See, e.g.*, *id.* at ¶ 12 (citing Lohmeier Dep., at 90:7-19 (Dckt. No. 89-2, at 22 of 72)); *see also id.* at ¶ 23 ("Ms. Lohmeier does not dispute that Ms. Wolak testified as described in paragraph 23, but she disputes that she exhibited such symptoms.") (citing Lohmeier Dep., at 117:1-4). So, the evidence cuts both ways, even though it seems to cut more deeply in one direction.

This Court will put to the side whether Lohmeier satisfied her job expectations (prong three). Even if Lohmeier carried her burden on that issue, it would not make a difference. Lohmeier has not carried her burden for another reason. Lohmeier has not shown that the Hospital treated a similarly situated employee more fairly (prong four), because she can't identify a comparator. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 919 (7th Cir. 2022) (cleaned up) ("We ask whether the two employees are situated similarly enough for a reasonable comparison.").

Lohmeier must identify a co-worker who had the same supervisor, was subject to the same standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*

(citation omitted). But the "congruence need not be perfect." *Id.* The idea is that a plaintiff must show that a similarly situated co-worker received different – meaning *better* – treatment.

Lohmeier points to "all nurses" on the ICU floor. *See* Pl.'s Resp., at 16 (Dckt. No. 98). True, the other nurses had the same supervisors, similar job duties, and access to the Pyxis machine. *Id.* And yes, the Hospital asked Lohmeier, and only Lohmeier, to take a drug test.

But there is a glaring explanation, and it provides a "differentiating" circumstance. *See Lesiv*, 39 F.4th at 919. The Hospital asked Lohmeier to take a drug test because she seemed impaired during her shift. In fact, she was the only nurse who seemed impaired. There is no evidence in the record that any other nurse in the ICU seemed sleepy, or groggy, or droopy, or intoxicated, or impaired.

There is lots of evidence in the record that Lohmeier's co-workers thought that she seemed impaired. *See, e.g.*, Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 99) (stating that Wolak believed that Lohmeier appeared "unusually slow to respond, avoided eye contact, had trouble keeping her eyes open, and slurred her speech"); *id.* at ¶ 25 (stating that Irving believed that Lohmeier "frequently paused and appeared to be lost in her train of thought"); *id.* at ¶ 31 (stating that Brzezinska thought that Lohmeier "did not look well"); *id.* at ¶ 32 (stating that Daniels believed that Lohmeier was "intoxicated" and noticed that her responses were "unusually slow" and her "eyes were not fully open"); *id.* at ¶ 34 (stating that Saccameno noticed that Lohmeier's response was "very slow and deliberate, her speech was slurred, her eyes were heavy, and she appeared very drowsy"); *id.* at ¶ 35 (stating that Daniels thought that Lohmeier was "having trouble understanding what was being said"); *id.* at ¶ 37 (stating that Amas thought that Lohmeier "appeared intoxicated with slurred speech, slow reaction time, bloodshot eyes, droopy eyelids, and a misstep in her gait"); *id.* at ¶ 38 (stating that

17

Dr. Ball observed that Lohmeier "had a slow response and glazed and sluggish eyes"); *id.* at ¶ 39 (stating that Dr. Ball thought that Lohmeier seemed "at least, to be possibly under the influence of drugs").

And on the flipside, there is no evidence in the record that anyone else in the ICU suffered from the same problem. *Id.* at ¶ 36. There is no testimony that any other employee slurred their speech, or seemed intoxicated, or anything along those lines. No one else got tested because no one else seemed to be on drugs.

Lohmeier believes that it is "speculation" that no one else seemed impaired. *Id.* But the lack of evidence is not "speculation." Lohmeier has not come forward with evidence that anyone else seemed impaired. And in fact, Lohmeier "testified that she did not personally see any ICU nurses or supervisors with droopy eyes or that she otherwise thought were intoxicated by narcotics or under the influence of a controlled substance." *Id.*

Simply put, Lohmeier took a drug test because she looked like someone who needed a drug test. The Hospital discovered that narcotics were missing, so they gave a drug test to the only person who seemed like she had taken drugs.

To carry her burden, Lohmeier would need to come forward with evidence that another co-worker exhibited the same sort of symptoms, but received different treatment from the Hospital. But that's not this case. No other nurse acted like they were on drugs, and skated by.

The Hospital had no reason to believe that the other nurses engaged in conduct involving "comparable seriousness." *See Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012) (citation omitted); *see also Keys v. Foamex, L.P.*, 264 F. App'x 507, 510, 512 (7th Cir. 2008) (co-workers who behaved normally at work were not similar comparators to a drug-tested employee who acted "odd").

There is no reason to keep driving down the *McDonnell Douglas* road. Defendants are entitled to summary judgment if Lohmeier fails to demonstrate one element of the prima facie case. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012) ("Summary judgment is appropriate if [a plaintiff] cannot demonstrate any one element of the prima facie case[.]"). And Lohmeier failed to show that she was treated worse than a similarly situated employee.[5]

The other route is to look at the case from the big picture perspective of *Ortiz*. Under *Ortiz*, a court must look at the evidence as a whole, and soak up all the evidence from a wide vantage point. The standard is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *See Ortiz*, 834 F.3d at 765. That is, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

Lohmeier puts forward eleven pieces of evidence in an attempt to build a case of discrimination. This Court will address each of them, one by one. Based on the record, and considering everything as a whole, a reasonable jury could not conclude that Lohmeier's national origin or color caused her termination. *See Reives*, 29 F.4th at 893.

***Comments about Hispanics.*** First, Lohmeier says that she heard Wolak and Brezinski say that Hispanic families demand "more care" than other patient families. *See* Pl.'s Resp., at 10 (Dckt. No. 98). Lohmeier testified that she heard them say that Hispanics are "always needy and that Hispanic people always, you know, demand more care than others. That Hispanic people

---

[5] For what it's worth, this Court also concludes that the Hospital gave a legitimate, non-discriminatory reason for her termination. The Hospital pointed to her fitness for duty (or lack thereof), and her likely role in the disappearance of the narcotics. And Lohmeier has not come forward with a sufficient showing of pretext. So, even if Lohmeier had satisfied her preliminary burden, her claims would fail.

are unreasonable with their family members in the hospital." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 99).

That comment is insufficient to support the inference that Wolak and Brezinski "tainted" the investigation. *See Salgado v. Graham Enter. Inc.*, 861 F. App'x 91, 94 (7th Cir. 2021). The clues pointing in Lohmeier's direction weren't few and far between, and they weren't hard to spot. Remember, Irving, Daniels, and Saccameno reported that Lohmeier behaved strangely. And the committee had the Pyxis and security badge access reports to consider, too.

*A Sham Investigation.* Next, Lohmeier says the Hospital targeted her because "the security records show[ed] two Caucasian and Non-Salvadoran nurses pulled the drugs, and Lohmeier was not in the equipment room when the drugs were taken." *See* Pl.'s Resp., at 11 (Dckt. No. 98). In the same vein, Lohmeier charges that the Hospital failed to "test, search, or investigate" anyone but her. *Id.* She also says the investigation was a "sham." *Id.* at 12.

The record evidence shows otherwise – and no reasonable jury could disagree. Lohmeier was *not* the only employee who the Hospital investigated. And the investigation was no "sham." If anything, the Hospital cast a wide net.

When Nurse Wolak discovered the missing morphine, Wolak "proceeded to ask all of the other nurses on the ICU floor if they had pulled any morphine that day." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 99). After Wolak told Daniels about the missing morphine, Daniels "walked around the ICU to ask the other employees if they could have possibly pulled the medication." *Id.* at ¶ 31.

When Nurse Zalas discovered the missing fentanyl, Zalas "started asking the other nurses if they had pulled fentanyl," and "[t]hey all said they had not." *Id.* at ¶ 29; *see also id.* at ¶ 43.

20

Zalas reported the missing fentanyl to Daniels, and once again, Daniels "interviewed all the nurses on the second shift and asked if they took the fentanyl." *Id.* at ¶ 44.

And then, a full investigation got underway. The Hospital interviewed Wolak, Zalas, Brzezinska, and other employees. *Id.* at ¶¶ 56, 62, 66.

True, the Hospital only drug tested Lohmeier. *See* Pl.'s Resp., at 12 (Dckt. No. 98). But the Hospital didn't get any reports that other nurses acted strangely. In other words, the evidence does not support the notion that the Hospital was "determined" to build a case against Lohmeier rather than "discover the truth." *Cf. Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020) (Barrett, J.). Instead, the evidence suggests that the Hospital's quest to "discover the truth" revealed only one likely culprit: Lohmeier.

***Policy Violations.*** Next, Lohmeier argues that the Hospital violated its own policy by "waiting more than an hour and allowing Lohmeier to complete all of her patient care before speaking to her." *See* Pl.'s Resp., at 11 (Dckt. No. 98). Selective enforcement of a disciplinary policy can support an inference of discrimination. *See Baker v. Macon Res., Inc.*, 750 F.3d 674, 678 (7th Cir. 2014) (per curiam). And the Hospital's Alcohol and Drug Policy demanded that a nursing supervisor "immediately respond" when the Hospital believed a nurse violated the policy. *See* Policy, at 12–13 of 46 (Dckt. No. 89-5).

The record cannot support an inference of a delay. Wolak (the first nurse) discovered the missing morphine at around 6:00 p.m. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 99). Wolak started asking around, and informed Daniels (the charge nurse) about the problem by 6:30 p.m. *Id.* at ¶ 30. Daniels then met Saccameno (the nursing supervisor) about the missing morphine at 6:45 p.m. *Id.* at ¶ 33.

According to Lohmeier, Daniels and Saccameno met with Lohmeier soon thereafter. *Id.* at ¶¶ 34–35. Saccameno then escorted Lohmeier to the emergency room. *Id.* at ¶ 35.

Daniels and Saccameno didn't take a coffeebreak, or make a pit-stop in a patient's room, or anything along those lines. They treated a serious problem like a serious problem, and took prompt action. No reasonable jury could decide otherwise.

**Humiliation.** Next, Lohmeier argues that Daniels and Saccameno "humiliated and harassed" her because they "publicly" told her she had to take a drug test. *See* Pl.'s Resp., at 11 (Dckt. No. 98). So, Lohmeier says, "rumors" and "gossip[]" spread. *Id.*

But Lohmeier testified that she only remembered the identity of two nurses definitively in the "vicinity" – James Irving and Russell Vallas. *See* Lohmeier's Dep., at 218:20 – 219:1 (Dckt. No. 99-1). Nurses went "back and forth" in the hallways, too. *Id.* at 219:2-4. But Lohmeier did not testify that Irving, Vallas, or the nurses flitting from room to room stood in ear shot. So, it's not clear that any other nurse heard the drug-test order.

Even more, *Lohmeier* said *she* told Irving that "management wanted her to take a drug test." *See* Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 100). In other words, Lohmeier fueled the "gossip" fire, too.

And more to the point, this argument is neither here nor there. A statement that Lohmeier needed to take a drug test is not evidence that they asked her to take a drug test for discriminatory reasons. The record shows that lots of employees thought that she seemed more than a little off.

**Taking An Eye Off Dr. Ball.** Charging on, Lohmeier complains that the Hospital "disregarded" Dr. Ball's medical opinion. *See* Pl.'s Resp., at 11 (Dckt. No. 98).

Dr. Ball didn't exactly give Lohmeier a clean bill of health. Dr. Ball testified that Lohmeier seemed like she "had maybe some slow reaction" and was "possibly under the influence." *See* Ball Dep., at 54:15-17 (Dckt. No. 99-13). But her notes also stated that Lohmeier was "[a]mbulating in steady gait" and "appear[ed] well enough to drive home." *See* Report, at 21 of 21 (Dckt. No. 99-13).

Lohmeier does not come forward with evidence that the decisionmakers saw Dr. Ball's report before they terminated her. Lohmeier simply states that the Hospital "failed to consider" it. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 79 (Dckt. No. 99). And Kirk (Executive Director of Human Resources) testified that the report was "not something that would come to" HR because it would go to "employee health." *See* Kirk Dep., at 108:17-22 (Dckt. No. 99-14); *see also* Defs.' Reply, at 9 (Dckt. No. 102-1). Even if the decision-makers did see it, they were entitled to weigh it among the other competing evidence.

At best, the evidence from Dr. Ball is evidence that Lohmeier was not seriously impaired by the time of her examination in the ER. It is not evidence that the company terminated her for discriminatory reasons.

***Driving Home.*** Next, Lohmeier argues that the Hospital violated its policy when it let Lohmeier drive home. *See* Pl.'s Resp., at 11 (Dckt. No. 98); *see* Policy, at 13 of 46 (Dckt. No. 89-5) (noting that the nursing supervisor should "assist" unfit employees in getting home safely by releasing the employee to a family member or calling a cab).

Maybe the Hospital technically violated the policy.[6] But minor deviations from written policies are "insufficient to avoid summary judgment" without supporting circumstantial

---

[6] Saccameno testified that Lohmeier said her husband would pick her up. *See* Saccameno Dep., at 81:14-21 (Dckt. No. 99-12).

evidence. *See Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012). There isn't supporting circumstantial evidence here.

*Testing Negative.* Lohmeier argues that the Hospital "disregarded" Dr. Evans's conclusion that Lohmeier's drug test should be classified as negative. *See* Pl.'s Resp., at 11 (Dckt. No. 98).

But the reason given by Dr. Evans matters. Dr. Evans didn't think that Lohmeier had no drugs in her system. He simply noted that positive drug tests are classified "negative" when an employee has a prescription that *could* explain it. *See* Hook Dep., at 40:1-16 (Dckt. No. 99-15).

The Hospital had other evidence to weigh, too. That body of evidence included the witness reports about Lohmeier's behavior, and the evidence about Lohmeier's presence in the rooms around the time of the drug diversion.

Lohmeier essentially asks this Court to act as a "super-personnel" department and second-guess how the Hospital weighed the evidence. But that is not this Court's job. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (citation omitted). The Hospital had latitude to give as much weight to Dr. Evans's report as it wanted, when weighed against the other evidence.

*Time Travel.* Next, Lohmeier accuses the Hospital of "falsely" representing to the Court that Lohmeier was the "only person" in the Pyxis room even though Lohmeier entered the room "after" the drugs were pulled. *See* Pl.'s Resp., at 12 (Dckt. No. 98).

The Hospital did not misrepresent anything. The Hospital did not hide the timing. The clock on the Pyxis machine showed someone pulled the vials *before* the clock on the security door showed Lohmeier entering the room.

The Hospital acknowledged the timing, and explained it. The Hospital pointed out that the clocks were not in sync. The clock on the door was a minute or two ahead of the clock on the Pyxis machine. *See* Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 89) ("At the time, both Daniels and Hook knew that the time clocks of the security system and the Pyxis machine were not synced and there was a slight variation between the two time clocks."); *see also id.* at ¶ 18.

**Grievance Procedure.** With her next breath, Lohmeier says that the Hospital "deprived" her of a meaningful employee grievance procedure. *See* Pl.'s Resp., at 12 (Dckt. No. 98). But the Hospital followed its policy. *See Berry v. Chi. Transit Auth.*, 788 F. Supp. 2d 756, 768 (N.D. Ill. 2011) ("Adherence to the [employer's] policy led to [the employee's] termination, not any other discriminatory motive.").

Indeed, Lohmeier admitted that "[c]onsistent with the Employee Grievance policy," Lohmeier selected one member of the three-member final review committee and the Hospital selected two others. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 76 (Dckt. No. 99).

Resisting, Lohmeier complains that she couldn't "address her accusers." *Id* at ¶ 77. But an employee grievance hearing is not a criminal trial. There is no Confrontation Clause. And Lohmeier does not argue that the Hospital normally allows a face-to-face show-down. *Id.* If the Hospital followed its normal procedures, Lohmeier is not entitled to anything more.

**The Report.** Finally, Lohmeier argues that the Hospital exposed its discriminatory intent by reporting her to the state. *See* Pl.'s Resp., at 12 (Dckt. No. 98). But Lohmeier *admitted* that "Hook personally understood that the Nursing Mandatory Report was required." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 99).

In other words, Lohmeier acknowledged that Hook submitted the report because she truly believed she had to submit the report, not because she was spurred by discrimination. And the

25

"honesty" of the Hospital's "stated reasons" for acting is what matters. *See McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009) (explaining that to show pretext, a plaintiff must show that an employer's stated reason for taking an employment action is "dishonest").

***The Bottom Line.*** Here's the bottom line, from a big picture perspective. The Court marched through Lohmeier's evidence piece by piece. Looking at the puzzle pieces, individually and collectively, they don't show a picture of discrimination. They don't add up to much. No reasonable jury could put them together and see discrimination based on her national origin or color.

After reviewing the evidence as a whole, and viewing it in a light favorable to Lohmeier (as the non-movant), the Court concludes that no reasonable jury could conclude that Defendants discriminated against her.

## B. Retaliation

The record does not support Lohmeier's retaliation claim under Title VII, either. To survive summary judgment, a reasonable jury must be able to find that: (1) Lohmeier engaged in Title VII-protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Lesiv*, 39 F.4th at 911 (citation omitted).

Lohmeier's protected activity is her Step 1 complaint on November 6, 2018, alleging discrimination. *See* Pl.'s Resp., at 22 (Dckt. No. 98). She identifies two "adverse" actions: deprivation of "meaningful review," and Hook's Nursing Mandatory Report submission. *Id.*

Assuming those were adverse actions, a jury could not find a causal link to Lohmeier's complaint. Lohmeier seems to rely only on the timing. *Id.* at 22–23. But "suspicious timing is rarely enough to create a triable issue." *See Igasaki*, 998 F.3d at 959 (cleaned up).

26

It is not enough here.  Lohmeier takes issue with her hearing.  But the hearing happened three *months* after Lohmeier submitted her complaint.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 71, 77 (Dckt. No. 99).  When courts allow the causation inference solely from suspicious timing, typically "no more than a few *days*" elapse between the protected activity and the adverse action.  *See Igasaki*, 988 F.3d at 959 (citation omitted) (emphasis added).

The evidence is no better when it comes to the Nursing Mandatory Report.  Lohmeier admitted that Hook submitted the Report because Hook "personally understood that the Nursing Mandatory Report was required."  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 99).  So, the answer to the critical question – whether there is evidence to support a "retaliatory motive" – is no.  *See Igaski*, 988 F.3d 959.

## II.     Americans with Disabilities Act

The next two claims involve the ADA.  Lohmeier alleged that the Hospital violated the ADA by discriminating based on her disability (Count IV), and failing to accommodate her disability (Count V).  *See* Cplt., at ¶¶ 185–196 (Dckt. No. 1).  Both claims fail for the same reason:  Lohmeier does not show that she has a disability within the ADA's meaning.

The ADA prohibits employers from discriminating against disabled employees.  *See* 42 U.S.C. § 12112(a).  To prove a discrimination claim, Lohmeier must show that:  (1) she is disabled; (2) she is otherwise qualified to perform the functions of her job with or without reasonable accommodation; (3) she suffered an adverse employment action, and (4) the adverse action was caused by her disability.  *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022).

The first element in a failure to accommodate claim is the same.  Lohmeier must show that she suffers from a disability within the meaning of the ADA.  *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) ("[T]o establish a claim for failure to

accommodate under the ADA, [a plaintiff] must establish that: (1) he is a qualified individual with a disability; (2) the [employer] was aware of his disability; and (3) the [employer] failed to reasonably accommodate that disability.").

Lohmeier cannot show she was disabled under the ADA. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities[7] of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(1).

Lohmeier tries to fit her conditions under the first prong, meaning a "physical or mental impairment that substantially limits one or more major life activities." *See* Pl.'s Resp., at 19–20 (Dckt. No. 98). She points to two purported disabilities: (1) shingles, and (2) mental health conditions (depression, PTSD, and anxiety). *Id.* at 20.

Lohmeier's shingles diagnosis is not an ADA disability. A jury could not find that it "substantially limit[ed]" her major life activities. *See Adams v. City of Chicago*, 706 F. Supp. 2d 863, 877 (N.D. Ill. 2010) (concluding that shingles was not an ADA disability where there was no evidence that it interfered with major life activities).

True, Lohmeier took two weeks of FMLA leave for her shingles diagnosis. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 99). But she returned to work without restrictions on August 8, two months before the incident on October 12. *Id.*; *see also Hancock v. Potter*, 531 F.3d 474, 479 (7th Cir. 2008) (employee's back injury, which caused "short-term absences," not an ADA disability).

Lohmeier offers no evidence supporting that the diagnosis substantially limited her life activities after she went back to work. She argues that she suffered from a "chronic painful

---

[7] Major life activities include sleeping, walking, speaking, hearing, and breathing. *See* 29 C.F.R. § 1630.2.

condition called post-herpetic neuralgia, *i.e.*, shingles flare-ups, that interfered with her ability to sleep, reduced her stress-tolerance, and caused fatigue." *See* Pl.'s Resp., at 20 (Dckt. No. 98). And disabilities do include episodic illnesses that limit major life activities when active. *See Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172–73 (7th Cir. 2013) (citation omitted).

But Lohmeier does not cite record evidence showing that her shingles flare-ups substantially limited her major life activities at the relevant time. Lohmeier cites evidence that her doctor told her that she "could" experience nerve pain. *See* Pl.'s Resp., at 20 (Dckt. No. 98) (citing Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12). But she does not cite evidence showing how the pain *actually* interfered with her ability to sleep, reduced her stress-tolerance, or caused fatigue. *See id.* (citing Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12).

Did Lohmeier take an extra 15 minutes to doze off each night? Or did she lay in bed tossing and turning for hours? Did she need an extra cup of coffee to start the day? Or was she so fatigued she couldn't swing her legs out of bed in the morning? Like the Court, the jury could only speculate. And speculation does not defeat a summary judgment motion. *See Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022).

Lohmeier pivots and points to her "PTSD, anxiety, and depression." *See* Pl.'s Resp., at 20 (Dckt. No. 98). But it is not enough to name a condition. Lohmeier must explain how it substantially limited her life activities. *See Lee v. Chi. Transit Auth.*, 696 F. App'x 752, 753 (7th Cir. 2017). Lohmeier did not build an argument. *See* Pl.'s Resp., at 20 (Dckt. No. 98). So, the jury could only speculate. And again, speculation is not enough. *See Foster*, 52 F.4th at 320.

Lohmeier has not come forward with sufficient evidence that she suffered from a disability within the meaning of the ADA, so she has no claim.

Lohmeier also failed to come forward with sufficient evidence on another prong, too. On this record, a reasonable jury could not find that the Hospital took adverse action against her based on her disability. *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). The lack of evidence of a causal connection is an independent basis for dismissal.

## III. FMLA Claims

The last federal claims involve the FMLA. Lohmeier alleged that the Hospital improperly denied her leave time (Count VI), and retaliated against her when she requested FMLA leave (Count VII). *See* Cplt., at ¶¶ 197–207 (Dckt. No. 1).

Start with the FMLA claim about the denial of leave (an "FLMA interference" claim). *See Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022). A jury must be able to find that: (1) Lohmeier was eligible for FMLA protections; (2) the Hospital was covered by the FMLA; (3) Lohmeier was entitled to FMLA leave;[8] (4) Lohmeier gave sufficient notice of intent to take leave; and (5) the Hospital interfered with, restrained, or denied FMLA benefits that Lohmeier was entitled to. *See id.* at 1089 (citing 29 U.S.C. § 2615(a)(1)).

The Court begins by defining Lohmeier's "interference" theory. The Hospital framed Lohmeier's theory as follows: the Hospital denied Lohmeier leave that she was entitled to receive by "terminat[ing] her employment." *See* Defs.' Mem., at 17 (Dckt. No. 88). Lohmeier does not refute that framing. *See* Pl.'s Resp., at 23–24 (Dckt. No. 98). So, the Court uses that theory.

"Employers may fire employees for poor performance[.]" *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) (citation omitted). On this record, a reasonable jury could not find

---

[8] The Hospital does not dispute that Lohmeier satisfies the first three prongs. *See* Defs.' Mem., at 17 (Dckt. No. 88). The Hospital does argue that Lohmeier gave insufficient notice (fourth prong). *Id.* But the Court does not address the argument because Lohmeier fails the fifth prong.

that Lohmeier's termination was motivated by her leave request instead of her poor performance. *See Simpson v. Off. of Chief Judge of Cir. Ct. of Will Cnty.*, 559 F.3d 706, 713 (7th Cir. 2009).

Lohmeier's only evidence seems to be the timing. *See* Pl.'s Resp., at 24 (Dckt. No. 98). But again, "suspicious timing is rarely enough to create a triable issue." *See Igasaki*, 998 F.3d at 959 (cleaned up). An FMLA leave request is not a get-out-of-jail-free card. It does not unlock an escape hatch, allowing an employee to slide away from poor-performance consequences.

Lohmeier's retaliation claim also fails because it depends on the same theory as Lohmeier's interference claim: that the Hospital terminated Lohmeier for requesting FMLA leave. *See* Pl.'s Resp., at 24 (Dckt. No. 98). But considering the record (the Court incorporates its Title VII analysis by reference), no jury could find that her FMLA request motivated her termination. *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020) (affirming summary judgment against employee on retaliation claim).

## IV. Illinois Human Rights Act

The last claim arises under state law. Lohmeier claims that the Hospital discriminated and retaliated against her based on her color, national origin, and disability status in violation of the Illinois Human Rights Act. *See* Cplt., at ¶¶ 208–19 (Dckt. No. 1).

The IHRA claim echoes the Title VII claim. Courts analyze Title VII discrimination claims and IHRA discrimination claims under "essentially identical" frameworks. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016) (citation omitted). Courts also deploy "practically indistinguishable" frameworks for ADA and IHRA discrimination claims. *See Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022).

So, there is nothing else for the Court to do. Lohmeier's Title VII and ADA claims did not survive summary judgment. So, her IHRA claim falls short, too.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted.

Date:  March 5, 2024

_____

Steven C. Seeger
United States District Judge